**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

Paul Stratton                                    :
                                                 :
                                                 :
                                                 :
            Plaintiff                            :
                                                 :     Case No.: 3:23-cv-00741-GTS-ML
v.                                               :
                                                 :
                                                 :
Imperium3 New York, Inc.,   iM3NY LLC,          :
Chaitanya Sharma, Shailesh Upreti and            :
Frank Poullas                                    :
                                                 :
                                                 :
            Defendants.                          :
                                                 :
_____       :

**STIPULATION AND ORDER**

It hereby is STIPULATED AND AGREED, by and between Plaintiff Paul Stratton and

Defendants Imperium3 New York, Inc., iM3NY LLC, Chaitanya Sharma, Shailesh Upreti and

Frank Poullas ("Defendants"), through the undersigned, who are authorized to enter into this

Stipulation, as follows:

a)  Defendants Imperium3 New York, Inc., Chaitanya Sharma, Shailesh Upreti and Frank

    Poullas hereby withdraw and dismiss without prejudice their previously filed

    counterclaims in this matter.

b)  The caption of this matter is amended as set forth above and Plaintiff's First Amended

    Complaint annexed hereto as Exhibit A is deemed filed and served.  Defendants waive

    any defenses based upon any allegations of improper service but retain all other defenses.

c)  Defendants shall answer, move, or otherwise respond to Plaintiff's First Amended

    Complaint in this matter by October 18, 2023.

d)  No prior requests for an extension in this regard have been made.


    LAW OFFICE OF ROBERT D. MCCREANOR, P.L.L.C.

    <u>/s/ Robert McCreanor</u>
    Robert McCreanor
    245 Saw Mill River Road, Ste. 106
    Hawthorne, New York 10532
    Tel: (845) 202-1833

    Attorneys for Plaintiff


    Law Office of Sharon M. Sulimowicz

    <u>/s/ Sharon Sulimowicz</u>
    Sharon Sulimowicz
    118 North Tioga Street, Suite 202
    Ithaca, New York 14850
    Telephone: (607) 256-0727

    Attorneys for All Defendants

    Dated: September 27, 2023

    SO ORDERED


    Glenn T. Suddaby
    U.S. District Judge


    September 29, 2023

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

Paul Stratton                 :

                        :

        Plaintiff        :

                        :    Case No.: 3:23-CV-0741 (GTS/ML)

v.                     :

                        :

Imperium3 New York, Inc.,   iM3NY LLC,  :
Chaitanya Sharma, Shailesh Upreti and  :
Frank Poullas               :

                        :

        Defendants.      :    JURY TRIAL DEMANDED

                        :
_____

## <u>FIRST AMENDED COMPLAINT</u>

## I.     PRELIMINARY STATEMENT

1.    Plaintiff Paul Stratton worked without compensation in Defendants' start-up lithium-ion battery business for over a year based upon Defendants' promises of compensation and incentive ownership units ("equity shares").  Plaintiff successfully assisted in soliciting more than $20 million in investment for Defendants but was never paid anything for at least 9 months of full-time labor.  As Defendants prepared to make a public offering of iM3NY LLC's equity shares, Defendants and their agents made grossly false public statements regarding the status of development of their products and services, clearly intended to influence the market value of their stock.  When Plaintiff repeatedly voiced objections to Defendants regarding these misrepresentations, Defendants terminated Plaintiff's employment and unilaterally forfeited his already vested equity shares in violation of a written contract.

2.     Plaintiff brings this action against Imperium3 New York, Inc., Chaitanya Sharma, Shailesh Upreti and Frank Poullas, for Defendants' failure to pay Plaintiff his promised compensation.

3.     Plaintiff alleges violations of the federal Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA") and New York Labor Law ("NYLL") Article 20-c § 741 *et seq.* ("NYLL") and causes of action for unjust enrichment, quantum meruit, and promissory estoppel.

4.     Plaintiff alleges violations of the NYLL's whistleblower protection provisions for the above referenced Defendants' and Defendant iM3NY LLC's illegal retaliation against Plaintiff for his stated objections to Defendants' illegal conduct.

5.     Plaintiff seeks his earned but unpaid and untimely paid wages and liquidated damages pursuant to the FLSA and the NYLL or, alternatively, his earned but unpaid compensation pursuant to common law doctrines of unjust enrichment, promissory estoppel and/or quantum meruit; lost wages, civil penalties and punitive damages for Defendants' illegal retaliation against Plaintiff and an award of reasonable attorneys' fees, costs, and interest.

## II.     JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to the FLSA, 29 U.S.C. § 201 *et seq.*, 29 U.S.C. § 216, and 28 U.S.C. §§ 1331 and 1337.  As this action arises under Acts of Congress regulating commerce, jurisdiction over Plaintiffs' claims for declaratory relief is conferred by 28 U.S.C. §§ 2201 and 2202.

7.     With respect to the state law claims, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 in that the state law claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.  Alternatively, this Court has diversity jurisdiction over the state law claims

pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship between Plaintiff and the Defendants and the amount in controversy exceeds $75,000.

8.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the acts and/or omissions giving rise to the claims alleged in this Complaint occurred within this district.

9.    Defendants reside and/or do business in this District.

### III.    THE PARTIES

10.    Plaintiff Paul Stratton is an adult individual and resident and citizen of the State of Connecticut. His consent to sue is attached hereto as Exhibit B.

11.    At all times relevant to this Complaint, Plaintiff was an employee of Defendants as that term is defined by

      a.   the FLSA, 29 U.S.C. § 203(e) (1); and

      b.   the NYLL § 190.

12.    At all times relevant to this Complaint, Plaintiff was an employee engaged in commerce or the production of goods for commerce, and/or was an employee in an enterprise engaged in commerce or the production of goods for commerce within the meaning of 29 U.S.C. § 203(b)(r)(1).  Specifically, Plaintiff transmitted and received information for Defendants across state lines and internationally through electronic correspondence, teleconferences and regular mail.  Plaintiff also personally travelled across state lines for work purposes.

13.    Upon information and belief, Defendant Imperium3 New York, Inc. is a New York corporation. Defendant Imperium3 New York, Inc. is headquartered at 2228 Center of Excellence 85 Murray Hill Road Vestal, NY 13850.  Defendant Imperium3 New York, Inc. is a citizen of New York State and is not a citizen of Connecticut.

14.    Upon information and belief, Defendant iM3NY LLC is a Delaware corporation doing business in Delaware and in the State of New York. and is headquartered at 2228 Center of Excellence 85 Murray Hill Road Vestal, NY 13850. Defendant iM3NY LLC is not a citizen of Connecticut.

15.    Defendant Chaitanya Sharma is the Chief Executive Officer and President of Imperium3 New York, Inc. and, upon information and belief, is a resident and citizen of the State of New Jersey.

16.    Defendant Shailesh Upreti is a member of the Board of Directors of Imperium3 New York, Inc. and, upon information and belief, is a resident and citizen of the State of New York.

17.    Defendant Frank Poullas is a member of the Board of Directors of Imperium3 New York, Inc., is the largest shareholder of equity in iM3NY LLC, which owns and exercises managerial authority over Imperium3 New York, Inc. Upon information and belief, he is a resident and citizen of the Commonwealth of Australia. Frank Poullas is also Executive Chairman of Magnis Energy Technologies, a publicly traded Australian company with a large ownership and management stake in iM3NY LLC and Imperium3 New York Inc.

18.    The Individual Defendants work together on a daily basis to control and manage the business of Defendants Imperium3 New York, Inc. and iM3NY LLC ("Corporate Defendants") which operate uniformly under the title "iM3NY."   For example, the Individual Defendants and their agents together communicate daily with the unitary executive staff and employees of the Corporate Defendants, issue directives and orders to executive staff and employees regarding assignments, work schedules, and staffing plans, and make public statements on behalf of the Corporate Defendants all under the name "iM3NY."

19.     The Corporate Defendants have common ownership in that Imperium3 New York, Inc. is a subsidiary of iM3NY LLC.

20.     From the beginning of Plaintiff's employment with Defendants on or about March 2020, Defendants identified their business as "iM3NY."

21.     Upon information and belief, at all times relevant to the Complaint, Defendants Chaitanya Sharma and Shailesh Upreti made all relevant decisions regarding Plaintiff's wages, working conditions, and employment status at the Defendant corporations.

22.     Upon information and belief, Defendant Frank Poullas determined whether, when and how much to compensate Plaintiff for his labor.

23.     Upon information and belief, Defendant Frank Poullas gave final approval to hire and fire Plaintiff.

24.     At all times relevant to the Complaint, Defendants Chaitanya Sharma and Shailesh Upreti had the power to hire and fire Plaintiff, set Plaintiff's wages, retain time and/or wage records, and otherwise control the terms and conditions of Plaintiff's employment at the Defendant corporation.

25.     At all times relevant to the Complaint, Defendants Chaitanya Sharma and Shailesh Upreti had the power to stop any illegal pay practices at the Defendant corporation.

26.     At all times relevant to the Complaint, Defendants Chaitanya Sharma and Shailesh Upreti actively managed, supervised, and directed the business affairs and operation of the Defendant corporation, and acted directly and indirectly in relation to the employees.

27.     At all times relevant to the Complaint,  including but not limited to March 2020 to May 2021, Defendants Chaitanya Sharma and Shailesh Upreti, directly supervised Plaintiff's work, assigning him projects, directing him to attend and participate in regular meetings

with other employees and executive staff, requiring him to obtain their approval for any actions undertaken in relation to his work, assigning him a company email account and expecting him to respond to email communication and be available for work purposes at any time during regular business hours and occasionally outside of those hours.

28. On or about June 2020, Defendants assigned Plaintiff to be the sole employee responsible for interfacing with an outside consultant, Donnelly & Associates.

29. At all times relevant to the Complaint, including but not limited to March 2020 to May 2021, Defendants provided Plaintiff with information and materials that were clearly sensitive in nature and expected to be maintained as confidential.

30. At all times relevant to the Complaint, including but not limited to March 2020 to May 2021, Plaintiff had no employment outside of his work for Defendants.

31. During the time period March 2020 to May 2021, Defendants persistently told Plaintiff and other employees that funding was "just around the corner" which, notwithstanding Defendants' failure to pay Plaintiff, caused Plaintiff to rely and depend on Defendants' promises and his employment with Defendants.

32. At all times relevant to the Complaint, Plaintiff was never assigned to supervise any other of Defendants' employees and never did supervise any other employee.

33. At all times relevant to the Complaint, Defendant Imperium3 New York, Inc. was an employer of Plaintiff as that term is defined by

  a. the FLSA, 29 U.S.C. § 203(e) (1); and

  b. the NYLL § 190.

34. At all times relevant to the Complaint subsequent to its formation, Defendant iM3NY LLC was an employer of Plaintiff as that term is defined by

      a.   the FLSA, 29 U.S.C. § 203(e) (1); and

      b.   the NYLL § 190.

35.     At all times relevant to the Complaint, Defendant Chaitanya Sharma was an employer of the Plaintiff as that term is defined by

      a.   the FLSA, 29 U.S.C. § 203(e) (1); and

      b.   the NYLL § 190.

36.     At all times relevant to the Complaint, Defendant Shailesh Upreti was an employer of the Plaintiff as that term is defined by

      a.   the FLSA, 29 U.S.C. § 203(e) (1); and

      b.   the NYLL § 190.

37.     At all times relevant to the Complaint, Defendant Frank Poullas was an employer of the Plaintiff as that term is defined by

      a.   the FLSA, 29 U.S.C. § 203(e) (1); and

      b.   the NYLL § 190.

38.     Upon information and belief, Defendants grossed more than $500,000 per year in investment revenue for the past three calendar years and individually and collectively are an enterprise engaged in commerce.

## IV.    STATEMENT OF FACTS

39.     On or about April 2020, Plaintiff began working for Defendants Imperium3 New York, Inc., Chaitanya Sharma, Shailesh Upreti and Frank Poullas in their start-up lithium-ion battery business headquartered in Vestal, New York.

40.     Plaintiff had been recruited to his position as Senior Vice President of Marketing and Sales in part by Defendants Chaitanya Sharma and Shailesh Upreti who promised

Plaintiff that he would be fully compensated for all labor and services performed on behalf of Imperium3 New York, Inc.

41.  Defendant Chaitanya Sharma further represented that the business was then not yet funded sufficiently to pay Plaintiff his compensation and that once anticipated funding was received, payment would be made for all work previously performed.  Defendant Chaitanya Sharma stated in writing to Plaintiff that he was in conversation with "the board" and Shailesh Upreti to finalize plans for compensation for "all the work done pre-funding."

42.  Defendant Chaitanya Sharma stated that Plaintiff's compensation would include a base salary of $150,000 plus reimbursement of relocation expenses, sales and management bonuses, health insurance, a 401(k) retirement savings plan, paid time off and the opportunity to earn equity shares in the business.

43.  On or about May 5, 2020, Defendant Chaitanya Sharma presented to Plaintiff a document with "iM3" imprinted in the letterhead and titled "Memorandum of Understanding."  This document stated *inter alia* that "[y]ou will be granted a Stock Options package worth $480,000 with a strike price to be determined at the time your Employment Agreement will be issued.  The vesting schedule for the Stock Options package is as follows: 25% of the stock options will vest at the completion of 12 months of employment [;] After the successful completion of the first 12 months of employment 1/36 of the remaining 75% of stock options will vest at the end of each month of employment."  The document was signed "Chaitanya Sharma and Mike Driscoll (on behalf of the iM3NY Board)."

44.  On or about May 15, 2020, Plaintiff countersigned and returned the document to Defendants.

45.    Beginning on or about May 2020, Defendants began to publicly hold out Plaintiff as their employee.  Specifically, Defendants edited their public website to identify Plaintiff as their Senior Vice President of Sales and Marketing.  Defendants prominently featured Plaintiff's professional background and experience in presentations to stakeholders, industry members and potential customers and employees.   From May 2020 onward, Defendants consistently and publicly used Plaintiff's employment as their Senior VP of Sales & Marketing as a selling point to benefit their business efforts.

46.    From the beginning of his employment with Defendants, Plaintiff regularly worked more than 40 hours per week.

47.    For example, during the work week November 15, 2020 to November 20, 2020, Plaintiff worked more than 48 hours in total.

    a.    On November 15, 2020, Plaintiff worked at least 3 hours preparing a virtual "town hall" presentation for Defendants.

    b.    On November 16, 2020, Plaintiff worked more than 8 hours including meetings with Bill Shannon, Donnelly and Associates, Shailesh Upreti, Stacey Duncan and Jen Gregory.

    c.    On November, 17, 2020, Plaintiff worked more than 8 hours including continued preparation for virtual town hall meeting and phone meetings.

    d.    On November 18, 2020, Plaintiff worked more than 13 hours including a full day onsite in the Endicott, NY area.

    e.    On November 19, 2020, Plaintiff worked more than 8 hours including a full day onsite in the Endicott, NY area.

    f.    On November 20, 2020, Plaintiff worked more than 8 hours including several

in-depth discussions of cell sizes and specifications.

48.   Plaintiff was paid nothing for his labor until March 2021.

49.   On or about April 19, 2021, Defendants presented to Plaintiff a written employment
      contract, a copy of which is annexed hereto as Exhibit C.  This document references Mr.
      Stratton's "continued employment" with Imperium3 New York, Inc. and sets forth the
      terms and condition of his employment.   While the employment contract purports to permit
      Imperium3 New York, Inc. to terminate Mr. Stratton's employment at any time and for any
      reason, it requires at least 3 months advanced written notice for termination without
      "Cause" and defines the limited bases on which a termination may occur for "Cause."

50.   On May 25, 2021, Plaintiff executed the agreement and returned it to Imperium3 New
      York, Inc.

51.   On or about May 2021, in conjunction with the execution of Plaintiff's employment
      contract, Imperium3 New York, Inc. and iM3NY, LLC presented to Plaintiff an Incentive
      Unit Award Agreement, a copy of which is annexed hereto as Exhibit A.

52.   This Incentive Unit Award Agreement entitles Plaintiff to incentive units or equity units in
      iM3NY, LLC based upon a vesting schedule and other terms and conditions set forth
      therein.   The vesting schedule begins on May 5, 2020, roughly one year prior to the
      issuance of this agreement and shortly after the commencement of Plaintiff's employment.
      Pursuant to Section 5(b) of the Incentive Unit Award Agreement, once Plaintiff's incentive
      units have vested they may only be forfeited in the event that he is terminated for Cause,
      violates the restrictive covenants imposed upon him by Section 7 of the Incentive Unit
      Award Agreement or violates his employment contract.

53.   The Incentive Unit Award Agreement was executed by Defendant Shailesh Upreti, Plaintiff

and, as required, by Plaintiff's spouse.

54.  On or about May 2021, based upon Defendant Chaitanya Sharma's representations as to the terms of his employment, Plaintiff relocated himself and his family to the Endicott, NY area.

55.  Plaintiff's work yielded significant benefits for Defendants.  Drawing upon decades of experience in the industry, Plaintiff connected Defendants to potential investors and customers.  In particular, Plaintiff played a key role in successfully soliciting a major investment in iM3NY LLC which provided the funds to compensate certain key employees, including Plaintiff, for their services.

56.  Plaintiff regularly received positive feedback from Defendant Chaitanya Sharma as well as board members and investors in Imperium3 New York, Inc. and iM3NY, LLC.

57.  On or about March 2021, Defendant Imperium3 New York, Inc. began regularly paying Plaintiff his compensation as set forth in the above referenced employment contract.

58.  At or about the same time, Defendant Imperium3 New York, Inc. also retroactively paid Plaintiff his compensation due from January 4, 2021 to March 2021.

59.  Plaintiff has never been paid anything for his labor performed from March 2020 to January 1, 2021.

60.  Upon information and belief, Defendant Frank Poullas determined if, when and how much Defendant Imperium3 New York, Inc. would pay Plaintiff for his labor performed from March 2020 to March 2021.

61.  During the course of his employment, Plaintiff observed that as Defendants planned the formation of a special purpose acquisition company (SPAC) and a public offering of its equity shares, Defendant Frank Poullas and his representatives made multiple public

misrepresentations regarding the status of development of Imperium3 New York, Inc.'s products and services.

62. For example, Defendant Frank Poullas and his representatives repeatedly stated that Defendants had already made product samples available to potential customers and is fully funded through 1.8 GWh of production, neither of which are true statements.

63. These statements and others occurred in settings and through media which indicate that they were intended to influence valuation of the Corporate Defendants' equity shares.

64. The Corporate Defendants' executive leadership, including Defendant Chaitanya Sharma, participated and acquiesced in this deceptive conduct, never once correcting even gross misrepresentations.

65. Plaintiff was seriously concerned about what he believed to be unethical and possibly illegal conduct by Defendants. He sought to correct the above referenced misrepresentations in meetings with Defendant Frank Poullas' representatives and addressed his concerns directly to Defendant Chaitanya Sharma.

66. Plaintiff told Defendant Chaitanya Sharma unequivocally that all public misrepresentations regarding the status of product sampling, manufacturing timetables, production capacity and value of current contracts must be corrected.

67. Meanwhile, as the Defendants moved closer to a public offering of equity units, Plaintiff became aware that the company's leadership felt there were insufficient equity units available to recruit critically needed employees to Defendants' business.

68. Defendant Chaitanya Sharma told Plaintiff that Defendants. desperately needed more engineers but that it was difficult to recruit individuals with such skills to Endicott, NY and that he "had nothing to attract with" and needed to have more equity units available.

69.    On or about November 17, 2021, Defendant Chaitanya Sharma presented to Plaintiff a
       letter stating that Imperium3 New York, Inc. was "amending your offer to the position [sic]
       of Sr. VP of Marketing and Community Outreach reporting to the CEO effective Jan 1,
       2022." The letter then set forth a revised compensation package and stated that Plaintiff's
       vested incentive units will total 8,801 by December 31, 2021 and that his unvested units
       would be forfeited and returned to the employee pool.

70.    In a subsequent conversation, Defendant Chaitanya Sharma acknowledged Plaintiff's
       significant contributions to Defendants' business and emphatically assured him that the
       company wished for him to continue in his current role.

71.    Plaintiff proposed an alternative revision to his compensation package and Defendant
       Chaitanya Sharma indicated that he would review it and follow up to finalize an agreement.

72.    On December 17, 2021, Plaintiff participated in a telephone call with Defendant Chaitanya
       Sharma and a Human Resources representative.  Defendant Chaitanya Sharma stated "we
       have decided to eliminate your position" and provided no further explanation.

73.    On December 24, 2021, Plaintiff received by mail a document titled "Separation,
       Termination, Release of Claims and Confidentiality Agreement."  The document contains
       the words "iM3NY Imperium3 New York, Inc." in the letterhead and states in part that Mr.
       Stratton's employment is terminated "for Cause" pursuant to Section 6 of the April 19,
       2021 employment agreement but does not specify any factual basis or provide any further
       explanation for Plaintiff's termination.  The document states that "[a]ll outstanding
       Unvested or Vested Awarded Units are forfeited and cancelled due to your termination for
       cause.  You have zero (0) Vested Units."

74.    Defendants are a sophisticated business operation and knew or should have known that

they were required to actually pay Plaintiff compensation in order for Plaintiff to be exempt from the minimum wage and overtime protections of the FLSA.  Defendants' violations of the FLSA were willful, they intentionally solicited and enjoyed the benefit of Plaintiffs' labor without paying him for such labor.

75. On April 10, 2022, Plaintiff commenced an action in the United States District Court for the District of Delaware against Defendants and iM3NY LLC alleging the same facts and violations as set forth here, as well as additional claims for breach of contract in relation to Defendants' termination and divestment of his shared in iM3NY LLC.  Defendants and iM3NY LLC moved to dismiss the case based *inter alia* on jurisdictional arguments.  On July 27, 2023, the Court granted said motion to the extent that it determined that there was no viable FLSA claim against iM3NY LLC (the Delaware company) which was formed after the alleged occurrence of FLSA violations and that the Court lacked personal jurisdiction over the remaining defendants (Imperium3 NY. Inc., Chaitanya Sharma, Shailesh Upreti and Frank Poullas) for the FLSA claims and that the Court should not exercise supplemental jurisdiction over the remaining state law claims.

76. On or about September 2022, Plaintiff was offered employment by a company that then determined it could not begin Plaintiff's employment until January 2023 because of the purported non-compete provisions in Defendants' contracts with Plaintiff and Defendants' publicly stated position that Plaintiff's employment was terminated for cause (which, if true, would likely render the non-compete provisions enforceable under controlling law).  Thus, as a direct result of Defendants' intentional retaliatory actions toward Plaintiff for his complaints about illegal and unethical conduct in Defendants' business, Plaintiff suffered a loss of income which was necessary to support his family.

***Defendants' Joint and Several Liability***

77.     At all times relevant to the Complaint subsequent to the formation of iM3NY LLC, the Defendants collectively formed a single integrated enterprise in that, as specified above, the Corporate Defendants are under the common ownership and financial control of the Individual Defendants, the Corporate Defendants operations are entirely interrelated, the Corporate Defendants are under the common management of the Individual Defendants, and the Individual Defendants maintain centralized control of labor relations.

78.     Defendants constitute a single integrated enterprise as follows:

   a.   Throughout the time period referenced herein, there has been complete continuity in operations and work force of the Defendants' business.

   b.   The single integrated enterprise was aware of the legal obligations toward Plaintiff undertaken by any predecessor employer including but not limited to Imperium3 New York, Inc.

   c.   The vast majority of capital funds for Defendants' business are held in iM3NY LLC and, upon information and belief, Defendant Imperium3 NY, Inc. lacks sufficient funds to continue operations without additional investment.

79.     Imperium3 NY Inc.is merely an alter ego of iM3NY LLC. The vast majority of capital funds for Defendants' business are held by iM3NY LLC, Defendants' business is conducted under the name iM3NY LLC, and Defendants make no distinction between the two corporate entities in their internal operations nor in their public communications. Upon information and belief, Defendants structured their employment arrangement with Plaintiff and others such that Imperium3 New York, Inc. is ostensibly the "employer" but does not hold funds sufficient to satisfy its obligations for employment law violations.

# V.   CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### *Fair Labor Standards Act – Minimum Wage*
### Against Defendants Imperium3 New York, Inc., Chaitanya Sharma, Shailesh Upreti and Frank Poullas

80.   Plaintiff restates, re-alleges and incorporates by reference all of the previous allegations as if fully set forth herein.

81.   Defendants willfully failed to timely pay Plaintiff at least the then applicable federal minimum wage for each hour worked in a workweek, in violation of 29 U.S.C. § 206.

82.   Due to Defendants' FLSA violations, Plaintiff is entitled to recover from Defendants, jointly and severally, his unpaid minimum wages, an additional equal amount as liquidated damages, liquidated damages for delayed minimum wages, reasonable attorneys' fees, and costs of the action, pursuant to 29 U.S.C. § 216 (b).

83.   Because Defendants' violations of the FLSA were willful, the three-year statute of limitations applies to this cause of action.

## SECOND CAUSE OF ACTION

### *Fair Labor Standards Act – Overtime*
### Against Defendants Imperium3 New York, Inc., Chaitanya Sharma, Shailesh Upreti and Frank Poullas

84.   Plaintiff restates, re-alleges and incorporates by reference all of the previous allegations as if fully set forth herein.

85.   Defendants willfully failed to timely pay Plaintiff overtime compensation at rates not less than one and one-half times the regular rate of pay for each hour worked in excess of forty hours in a workweek, in violation of 29 U.S.C. § 207 (a)(1).

86.    Due to Defendants' FLSA violations, Plaintiff is entitled to recover from Defendants, jointly and severally, his unpaid overtime compensation, an additional equal amount as liquidated damages, liquidated damages for delayed payment of overtime wages, reasonable attorneys' fees, and costs of the action, pursuant to 29 U.S.C. § 216 (b).

87.    Because Defendants' violations of the FLSA were willful, the three-year statute of limitations applies to this cause of action.

### THIRD CASUE OF ACTION

### *NYLL – Promised Rate of Pay*

**Against Defendants Imperium3 New York, Inc., Chaitanya Sharma, Shailesh Upreti and Frank Poullas**

88.    Plaintiff re-alleges and incorporates by reference all of the previous allegations as if fully set forth herein.

89.    Defendants willfully violated Plaintiff's rights by failing to pay Plaintiff for each hour worked at his promised rate of pay as required by Article 6 of the NYLL.

90.    Due to Defendants' New York Labor Law violations, Plaintiff is entitled to recover from Defendants, jointly and severally, his unpaid overtime wages, liquidated damages for unpaid wages, reasonable attorneys' fees, interest, and costs of the action, pursuant to NYLL §§ 198 and 663.

### FOURTH CAUSE OF ACTION

### *NYLL – Overtime*

**Against Defendants Imperium3 New York, Inc., Chaitanya Sharma, Shailesh Upreti and Frank Poullas**

91.    Plaintiff re-alleges and incorporates by reference all of the previous allegations as if fully

set forth herein.

92.   Defendants willfully violated Plaintiff's rights by failing to pay Plaintiff overtime compensation at rates not less than one and one-half times the regular rate of pay for each hour worked in excess of forty hours in a workweek.

93.   Due to Defendants' New York Labor Law violations, Plaintiff is entitled to recover from Defendants, jointly and severally, his unpaid overtime wages, liquidated damages for unpaid wages, reasonable attorneys' fees, interest, and costs of the action, pursuant to NYLL §§ 198 and 663.

## FIFTH CAUSE OF ACTION

### *New York Labor Law (NYLL) Timely Payment Violations*

**Against Defendants Imperium3 New York, Inc., Chaitanya Sharma, Shailesh Upreti and Frank Poullas**

94.   Plaintiff realleges and incorporates by reference all of the previous allegations as if fully set forth herein.

95.   Defendants failed to pay Plaintiff on a semi-monthly basis as required by NYLL § 191(1)d).

96.   As a result of Defendants' violations, Plaintiff is entitled to recover liquidated damages, as well as interest and reasonable attorney's fees, pursuant to NYLL§ 198(1-a).

## SIXTH CAUSE OF ACTION

### *NYLL – Wage Notice*

**Against Defendants Imperium3 New York, Inc., Chaitanya Sharma, Shailesh Upreti and Frank Poullas**

97.   Plaintiff re-alleges and incorporates by reference all of the previous allegations as if fully set forth herein.

98.  Plaintiff did not receive at the time of hiring a wage notice containing the information outlined in NYLL § 195(1)(a), such as the rate of pay.

99.  Defendants willfully failed to provide Plaintiff, at the time of hiring, a wage notice containing the information required by NYLL § 195(a), such as the rate of pay.

100.  Due to Defendants' New York Labor Law violations, Plaintiff is entitled to recover from Defendants, jointly and severally, statutory damages for failure to provide required wage notices and wage statements, reasonable attorneys' fees, interest, and costs of the action, pursuant to NYLL §§ 198 and 663.

## SEVENTH CAUSE OF ACTION

### *NYLL – Wage Statement*

**Against Defendants Imperium3 New York, Inc., Chaitanya Sharma, Shailesh Upreti and Frank Poullas**

101.  Plaintiff re-alleges and incorporates by reference all of the previous allegations as if fully set forth herein.

102.  Plaintiff did not receive weekly wage stubs or statements accurately containing all information required by NYLL § 195(3), such as dates of work, rate of pay for regular and overtime hours, and number of regular and overtime hours worked.

103.  Throughout the entire course of his uncompensated employment, Defendants willfully failed to provide Plaintiff weekly wage stubs or statements accurately containing all information required by NYLL § 195(3), such as dates of work, rate of pay for regular and overtime hours, and number of regular and overtime hours worked.

104.  Due to Defendants' New York Labor Law violations, Plaintiff is entitled to recover from Defendants, jointly and severally, statutory damages for failure to provide required wage

notices and wage statements, reasonable attorneys' fees, interest, and costs of the action, pursuant to NYLL §§ 198 and 663.

## EIGHTH CAUSE OF ACTION

### *Unjust Enrichment*

**Against Defendants Imperium3 New York, Inc., Chaitanya Sharma, Shailesh Upreti and Frank Poullas**

105.    Plaintiff re-alleges and incorporates by reference all of the previous allegations as if fully set forth herein.

106.    Plaintiffs alleges that he has conferred substantial benefits on the Defendants by his labor for which he is entitled to as-yet unpaid compensation.

107.    Plaintiff performed his labor for Defendants in the good faith belief that he would be properly compensated.

108.    Defendants accepted, indeed required, the services from Plaintiff as part of his employment.

109.    Plaintiff reasonably expected to be compensated for his labor which reasonable expectation Defendants fostered with their verbal and written promises.

110.    The reasonable value of the unpaid time may be readily calculated from the compensation subsequently paid to the Plaintiff by Defendants.

## NINTH CAUSE OF ACTION

### *Quantum Meruit*

**Against Defendants Imperium3 New York, Inc., Chaitanya Sharma, Shailesh Upreti and Frank Poullas**

111.    Plaintiff re-alleges and incorporates by reference all of the previous allegations as if fully

set forth herein.

112.   Plaintiff is now entitled to recover a fair and reasonable amount in quantum meruit for the services he performed for Defendants, which amount is to be determined at trial but shall be no less than the compensation promised to Plaintiff by Defendants.

## TENTH CAUSE OF ACTION

### *Promissory Estoppel*

### Against Defendants Imperium3 New York, Inc., Chaitanya Sharma, Shailesh Upreti and Frank Poullas

113.   Plaintiff re-alleges and incorporates by reference all of the previous allegations as if fully set forth herein.

114.   Defendants made a clear and unambiguous promise to Plaintiff that they would fully compensate him for all of his labor.

115.   Plaintiff reasonably and foreseeably relied on the promise.

116.   Plaintiff sustained an injury by reason of his reliance on Defendants' promise.

117.   Defendant is entitled the compensation which he was promised.

## ELEVENTH CAUSE OF ACTION

### *Breach of Contract*

### Against All Defendants

118.   Plaintiff re-alleges and incorporates by reference all of the previous allegations as if fully set forth herein.

119.   Defendants and Plaintiff entered into a binding written agreement annexed hereto as Exhibit C.

120.   Defendants violated this agreement by falsely asserting that Plaintiff was terminated "for

cause."

121.   Plaintiff has suffered damage as a direct and proximate result of Defendants' breaches, including, but not limited to, being deprived of three months of continued employment to, including salary and continued vesting of shares, to which he is entitled to upon notification of termination not for cause.

122.   As a direct and proximate result of Defendant's breach, Plaintiff is legally and equitably entitled to damages to be decided by the trier of fact in this action, as set forth above, as well and any and all further damages allowable under the law.

### THIRTEENTH CAUSE OF ACTION

### *Breach of Covenant of Good Faith and Fair Dealing*

### Against All Defendants

123.   Plaintiff re-alleges and incorporates by reference all of the previous allegations as if fully set forth herein.

124.   Defendants breached the covenants of good faith and fair dealing implicit in Plaintiff's employment contract (Exhibit C).

125.   Plaintiff is entitled to actual and consequential damages for Defendants' actions.

### FOURTEENTH CAUSE OF ACTION

### *NYLL – Whistleblower Protections*

### Against All Defendants

126.   Plaintiff re-alleges and incorporates by reference all of the previous allegations as if fully set forth herein.

127.   Defendants took and continue to take retaliatory actions, including but not limited to

termination of Plaintiff's employment and unilateral forfeiture of Plaintiff's already vested incentive unit awards, against Plaintiff because Plaintiff disclosed, or threatened to disclose to a supervisor or to a public body an activity, policy or practice of the employer that Plaintiff reasonably believed was in violation of law, rule or regulation or that Plaintiff reasonably believed posed a substantial and specific danger to the public health or safety and/or because Plaintiff objected to, or refused to participate in any such activity, policy or practice.

128.   Due to Defendants' New York Labor Law § 740 violations, Plaintiff is entitled to recover from Defendants, jointly and severally front pay in lieu of reinstatement, compensation for lost wages, benefits and other remuneration, civil penalties, punitive damages and reasonable attorneys' fees and costs. Plaintiff is also entitled to an injunction prohibiting continued violation of this law.

## FIFTEENTH CAUSE OF ACTION

### *Tortious Interference with Prospective Economic Relations*

### Against All Defendants

129.   Plaintiff re-alleges and incorporates by reference all of the previous allegations as if fully set forth herein.

130.   Defendants interfered with Plaintiff's economic prospects and such conduct was wrongful or improper independent of the interference allegedly caused thereby.

131.   Due to Defendants' tortious interference with Plaintiff's prospective economic relations, Plaintiff suffered a loss of income and is entitled to recover from Defendants' corresponding damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

132.    Declare the Defendants' conduct complained of herein to be in violation of Plaintiff's rights under the Fair Labor Standards Act;

133.    Declare the Defendants' conduct complained of herein to be in violation of Plaintiff's rights under the New York Labor Law;

134.    Order Defendants to pay to Plaintiff all minimum and overtime wages owed consistent with FLSA;

135.    Order Defendants to pay to Plaintiff all promise regular and overtime wages owed, consistent with NYLL;

136.    Order Defendants to pay to Plaintiff the statutorily prescribed penalties for failure to provide Plaintiff with notices and statements required by NYLL;

137.    Award Plaintiff liquidated damages for all wages withheld in violation of FLSA;

138.    Award Plaintiff additional liquidated damages for all wages withheld or delayed in violation of NYLL;

139.    Award Plaintiff an amount commensurate with the value of services performed in reliance on Defendants' promises;

140.    Award Plaintiff front pay in lieu of reinstatement, compensation for lost wages, benefits and other remuneration, civil penalties, and punitive punitive damages pursuant to NYLL § 740.

141.    Award Plaintiff an amount equal to the loss of income suffered from Defendants' tortious interference with Plaintiff's prospective economic relations;

142.    Declare Defendants' actions to constitute breach of contract;

143.    Award Plaintiff an amount equal to three months of his salary;

144.    Award Plaintiff reasonable attorneys' fees, costs and interest; and

145.    Award Plaintiff such other legal and equitable relief as the Court deems appropriate.

### REQUEST FOR TRIAL BY JURY

Plaintiff respectfully requests a trial by jury as to all claims to which he is entitled.


RESPECTFULLY SUBMITTED,

/s/ Robert McCreanor
ROBERT MCCREANOR
Law Office of Robert D. McCreanor, P.L.L.C.
245 Saw Mill River Rd. Suite 106
Hawthorne, NY 10532
(845) 202 1833
rmccreanor@rdmclegal.com


**ATTORNEYS FOR THE PLAINTIFF**

Dated: September 25, 2023

# EXHIBIT A

## INCENTIVE UNIT AWARD AGREEMENT

This Incentive Unit Award Agreement (this "**Agreement**") is executed and agreed to as of the grant date set forth in the table below (the "**Grant Date**"), by and among iM3NY LLC, a Delaware limited liability company (the "**Company**"), and the Person whose name appears in the table below under "Incentive Unitholder" ("**Incentive Unitholder**"). Capitalized terms used but not defined in this Agreement shall have the meanings assigned to them in the Limited Liability Company Agreement of the Company, dated April 29, 2021 (the "**Company LLC Agreement**"). The Company and Incentive Unitholder are sometimes referred to individually as a "**Party**" and collectively as the "**Parties**".

**WHEREAS**, Incentive Unitholder is an employee of Imperium3 New York, Inc., a New York corporation (the "**Employer**"), a subsidiary of the Company, pursuant to the terms of an employment agreement, dated April 19, 2021 between Incentive Unitholder and the Employer (the "**Service** Agreement");

**WHEREAS**, subject to the terms and conditions set forth in this Agreement and the Company LLC Agreement, the Company desires to issue to Incentive Unitholder, on the terms and conditions set forth in this Agreement, the number of Incentive Units in the Company specified in this Agreement (the "**Incentive Units**"); and

**WHEREAS**, the Company and Incentive Unitholder each desire to agree to (i) forfeiture restrictions that will apply to the Incentive Units, (ii) repurchase rights that will apply to the Incentive Units and (iii) the terms and conditions of such forfeiture restrictions and repurchase rights.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained in this Agreement and other good and valuable consideration, each of the Company and Incentive Unitholder hereby agrees as follows:

| Incentive Unitholder: | Paul Stratton |
|---|---|
| **Number of Incentive Units:** | 22,233 |
| **Grant Date:** | June 7, 2021 |
| **Participation Threshold:** | $21.05 |

1.    **Issuance of Incentive Units**.

(a)    The Company hereby issues 22,233 Incentive Units to Incentive Unitholder effective as of the Grant Date. Each Incentive Unit has a Participation Threshold of $21.05 dollars ($Twenty one and five cents) (excluding Tax Distributions). The Incentive Units are intended to constitute "profits interests" within the meaning of Internal Revenue Service Revenue Procedures 93-27 and 2001-43 (or the corresponding requirements of any subsequent guidance promulgated by the Internal Revenue Service or other applicable law) and, therefore, the capital account associated with each such Incentive Unit at the time of its issuance is equal to zero dollars ($0.00). One hundred percent (100%) of the Incentive Units will be subject to time vesting (the "**Time-Based Incentive Units**").

102175147.2

2.      **Terms of Issuance**.

(a)      No provision contained in this Agreement shall entitle Incentive Unitholder to remain an employee of, or otherwise be affiliated with, the Employer, the Company or any of the Company's other Subsidiaries (collectively, the "**Company Group**") for any particular period of time. All references in this Agreement to "**Remains an Employee**" (including the correlative terms "**Remained an Employee**" and "**Remain an Employee**") shall mean and be construed as meaning, with respect to Incentive Unitholder, as of the time of determination, Incentive Unitholder has been continuously employed or engaged since the Grant Date in a position in which Incentive Unitholder's duties involve providing material services to the Company Group.

(b)      Incentive Unitholder shall (i) make a timely election under Section 83(b) of the Code in substantially the form attached hereto as <u>Exhibit A</u> with respect to the Incentive Units that, as of the Grant Date, are subject to a "substantial risk of forfeiture" within the meaning of Section 83 of the Code and the Treasury Regulations promulgated thereunder and (ii) consult with Incentive Unitholder's tax advisor to determine the tax consequences of filing such an election under Section 83(b) of the Code. It is Incentive Unitholder's sole responsibility, and not the responsibility of the Company, the Employer or any of their respective Affiliates, to timely file an election under Section 83(b) of the Code even if Incentive Unitholder requests the Company, the Employer or any of their respective Affiliates or any of their respective managers, directors, officers, employees, agents or authorized representatives (including attorneys, accountants, consultants, bankers, lenders, prospective lenders or financial representatives) to assist in making such filing and even if any of such Persons agree to do so. Incentive Unitholder shall provide the Company, on or before the due date for filing such election, proof that such election has been timely filed. For the avoidance of doubt, Incentive Unitholder shall be solely responsible for any tax liability that may result from any failure to make a timely election under Section 83(b) of the Code with respect to the Incentive Units described in clause (i) of this <u>Section 2(b)</u>. In the event that Incentive Unitholder fails to make a timely election under Section 83(b) of the Code with respect to such Incentive Units, Incentive Unitholder shall nonetheless be treated by the Company as the owner of such Incentive Units for federal income tax purposes in accordance with Internal Revenue Service Revenue Procedure 2001-43 (or the corresponding requirements of any subsequent guidance promulgated by the Internal Revenue Service or other applicable law).

(c)      By Incentive Unitholder's execution of this Agreement, Incentive Unitholder is hereby bound by the terms of the Company LLC Agreement as a Member. The Incentive Units are subject to all of the terms and restrictions applicable to Incentive Units as set forth in the Company LLC Agreement and this Agreement. Effective as of the Grant Date, Incentive Unitholder has executed a counterpart signature page to the Company LLC Agreement.

3.      **Unvested Awarded Units**. All of the Incentive Units issued pursuant to this Agreement shall (a) initially be Unvested Incentive Units under the Company LLC Agreement, (b) be subject to all of the restrictions on Unvested Incentive Units (as well as on Incentive Units, in general) under the Company LLC Agreement and (c) carry only such rights as are conferred on Unvested Incentive Units under the Company LLC Agreement (such Incentive Units, the "**Unvested Awarded Units**"). Unvested Awarded Units shall become Vested Awarded Units (as defined below) in accordance with the provisions of <u>Sections 4</u> or <u>5</u>.

4.      **Vesting of Awarded Units**.

(a)      Except as otherwise provided in <u>Section 5</u>, the Time-Based Incentive Units shall become Vested Incentive Units ("**Vested Awarded Units**") in accordance with this <u>Section 4(a)</u> so long as Incentive Unitholder Remains an Employee from the Grant Date through each applicable vesting date. The

vesting schedule for the Time-Based Incentive Units is as follows: (i) one-fourth (1/4th) of the Time-Based Incentive Units shall vest on the first anniversary of May 5, 2020 (the "**Vesting Start Date**"); and (ii) one-forty-eighth (1/48th) of the Time-Based Incentive Units shall vest on each of the thirty-six (36) subsequent monthly anniversaries of the Vesting Start Date following the first anniversary of the Vesting Start Date.

(b)  Upon or immediately prior to the consummation of a Sale of the Company or a Public Offering the Board may, in its sole and absolute discretion, elect to (i) accelerate the vesting of some, all or none of the remaining Unvested Awarded Units, (ii) terminate, cancel or declare forfeit some, all or none of the Unvested Awarded Units which will not, by their terms, become Vested Awarded Units as a result of the consummation of such Sale of the Company or Public Offering, or (iii) take no action with respect to some, all or none of the Unvested Awarded Units.

5.    **Repurchase and Forfeiture of Awarded Units**.

(a)    **Repurchase Right.** All Incentive Units shall be subject to the forfeiture and repurchase provisions contained in this Section 5 and Section 9.8 of the Company LLC Agreement.

(b)    **Forfeiture.** In the event that Incentive Unitholder's Service is terminated at any time (A) by the Company Group without Cause, (B) due to a resignation by Incentive Unitholder, or (C) due to Incentive Unitholder's death, all outstanding Unvested Awarded Units will immediately be forfeited and cancelled, and the Vested Awarded Units shall be subject to Section 4. If Incentive Unitholder's Service is terminated at any time by the Company Group for Cause or if Incentive Unitholder at any time breaches his or her obligations under Section 7 or the Service Agreement, then all Incentive Units granted hereunder (whether Vested Awarded Units or Unvested Awarded Units) shall immediately be forfeited and cancelled.

6.    **Distributions**. Notwithstanding anything to the contrary in the Company LLC Agreement, no holder of an Unvested Awarded Unit shall be entitled to receive any distributions in respect of any such Unvested Awarded Unit.

7.    **Restrictive Covenants.**

(a)    **Confidentiality.**

(i)    As a condition precedent to the issuance of the Incentive Units to Incentive Unitholder, Incentive Unitholder may not disclose the terms of the issuance of the Incentive Units, other than to his or her immediate family or to his or her personal financial or legal advisors. Incentive Unitholder shall not use or disclose to any Person any Confidential Information of which Incentive Unitholder is or becomes aware, whether or not such information is developed by him or her, for any reason or purpose whatsoever, nor shall he or she make use of any of the Confidential Information for his or her own purposes or for the benefit of any Person except for the Company Group, except (i) to the extent that such disclosure or use is directly related to and required by Incentive Unitholder's performance in good faith of duties assigned to Incentive Unitholder by the Company Group with respect to his or her Service or (ii) to the extent required to do so by a law or legal process, including a court of competent jurisdiction. Incentive Unitholder shall not modify, reverse engineer, decompile, create other works from or disassemble any software programs contained in the Confidential Information of the Company Group unless permitted in writing by the Company Group. Incentive Unitholder will, at the sole expense of the Company Group, take all reasonable steps to safeguard Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft.

(ii)    In accordance with the Defend Trade Secrets Act of 2016, Incentive Unitholder is hereby notified by the Company that Incentive Unitholder will not be held criminally or civilly

liable under any federal or state trade secret law for the disclosure of a trade secret that: (A) is made (x) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (y) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding. Incentive Unitholder is further notified by the Company that, if Incentive Unitholder files a lawsuit for retaliation by an employer for reporting a suspected violation of law, then Incentive Unitholder may disclose the employer's trade secrets to Incentive Unitholder's attorney and use the trade secret information in the court proceeding if Incentive Unitholder: (1) files any document containing the trade secret under seal; and (2) does not disclose the trade secret, except pursuant to court order.

(b)    **Non-Compete.** Unless otherwise stated or expressed in the Incentive Unitholder's Employment Agreement, Incentive Unitholder acknowledges and agrees that Incentive Unitholder's Service to the Company Group is unique in nature and that the Company Group would be irreparably damaged if Incentive Unitholder were to provide similar services to any Person competing with the Company Group. Accordingly, in consideration for the payments and benefits under this Agreement, Incentive Unitholder covenants and agrees that, during Incentive Unitholder's Service and, if Incentive Unitholder's Service is terminated for Cause, then for a period of twelve (12) months thereafter, Incentive Unitholder shall not, and shall cause his or her Affiliates not to, directly or indirectly, through or in association with any third party, anywhere in the United States or in any other country in which the Company does business, (i) be employed by, consult for, render assistance to, contract with, serve as a director for, or otherwise assist any Person engaging in a Competing Business at any time during Incentive Unitholder's Service, (B) engage in, sell or provide any products or services that are the same, similar, or otherwise competitive with the products or services in any industry in which the Company Group engages or operates at any time during Incentive Unitholder's Service or (C) own, acquire, or control any interest, financial or otherwise, in a third party or business engaged in selling or providing the same, similar or otherwise competitive services or products in any industry in which the Company Group engages or operates at any time during Incentive Unitholder's Service, other than ownership of five percent (5%) or less of the equity of a publicly-traded company.

(c)    **Non-Solicitation and Non-Interference.** Unless otherwise stated or expressed in the Incentive Unitholder's Employment Agreement, during Incentive Unitholder's Service and for a period of twelve (12) months thereafter, Incentive Unitholder will not, and will cause Incentive Unitholder's Affiliates not to, directly or indirectly, through or in association with any third party, (i) take any action which may interfere with, impair, subvert, disrupt or alter the relationship, contractual or otherwise, between any member of the Company Group and any current or prospective customer, supplier, association, distributor, payer, vendor, developer, service provider, licensor or licensee, independent sales agents or other material business relation of such member of the Company Group, (ii) call on, solicit or service, engage or contract with any current or prospective customer, supplier, association, distributor, payer, vendor, developer, service provider, licensor or licensee, independent sales agents or other material business relation of a member of the Company Group in connection with any Competing Business, provided that the restrictions contained in this clause (ii) will not apply to any customers, suppliers, associations, distributors, payers, vendors, developers, service providers, licensors, licensees, independent sales agents, and other business relations with whom Incentive Unitholder had business relationships prior to the commencement of Incentive Unitholder's Service, (iii) solicit, induce, recruit or encourage any employees of or consultants to the Company Group to terminate their relationship with the Company Group or take away or hire such employees or consultants, (iv) divert or take away the business or patronage (with respect to products or services of the kind or type developed, produced, marketed, furnished or sold by the Company Group) of any of the clients, customers or accounts, or prospective clients, customers or accounts, of the Company Group or (v) attempt to do any of the foregoing, either for Incentive Unitholder's own purposes or for any other third party.

102175147.2

4

(d)     **Non-Disparagement.** Incentive Unitholder shall not, in any manner, directly or indirectly, take any action or make any oral or written statement to any Person that disparages or places the members of the Company Group or any of their respective officers, shareholders, members or advisors, or any member of the Board, in a false or negative light (whether such action or statement is made publicly or privately, whether or not in the form of opinion, and whether or not it is truthful); *provided*, *however*, that Incentive Unitholder shall not be required to make any untruthful statement or to violate any law.

(e)     **Intellectual Property.** As a condition precedent to the issuance of the Incentive Units to Incentive Unitholder under this Agreement, Incentive Unitholder assigns, transfers and conveys to the Company Group all of Incentive Unitholder's right, title and interest in and to all Work Product (as defined below). Incentive Unitholder agrees that all Work Product belongs in all instances to the Company Group. Incentive Unitholder will promptly disclose such Work Product to the Company Group and perform all actions reasonably requested by the Company Group (whether during or after Incentive Unitholder's Service) to establish and confirm the Company Group's ownership of such Work Product (including, without limitation, the execution and delivery of assignments, consents, powers of attorney and other instruments) and to provide reasonable assistance to the Company (whether during or after Incentive Unitholder's Service) in connection with the prosecution of any applications for patents, trademarks, trade names, service marks or reissues thereof or in the prosecution or defense of interferences relating to any Work Product. Incentive Unitholder recognizes and agrees that the Work Product, to the extent copyrightable, constitutes works for hire under the copyright laws of the United States.

(f)     **Acknowledgement; Enforcement.**

(i)     By accepting the Incentive Units, Incentive Unitholder acknowledges that the obligations set forth in this Section 7 (the "**Restrictive Covenants**") may limit his or her ability to earn a livelihood in a business similar to the business of the Company Group and its Affiliates, but Incentive Unitholder nevertheless believes that he or she has received and will receive sufficient consideration and other benefits in connection with Incentive Unitholder's Service with the Company or other member of the Company Group to clearly justify such Restrictive Covenants and that, given Incentive Unitholder's skills and ability, the Restrictive Covenants would not prevent him or her from otherwise earning a living. Incentive Unitholder hereby acknowledges and agrees that the same are reasonable, do not confer a benefit upon the Company Group disproportionate to the detriment of Incentive Unitholder, are reasonable in time, scope and territory and necessary for the protection of the Company Group and are an essential inducement to the Company's issuance of the Incentive Units.

(ii)     In the event of a breach or threatened breach of the Restrictive Covenants, the Company Group may, in addition to other rights and remedies existing in its favor at law or in equity, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, the provisions hereof (without posting a bond or other security) or require Incentive Unitholder to account for and pay over to the Company all compensation, profits, moneys, accruals, increments or other benefits derived from or received as a result of any transactions constituting a breach of the Restrictive Covenants, if and when the final and non-appealable judgment of a court of competent jurisdiction is so entered against Incentive Unitholder.

(iii)     If any Restrictive Covenant is unenforceable with respect to the duration, activity, subject, or geographic area of restriction of such Restrictive Covenant, then such restriction shall be construed, judicially modified, or "blue penciled" in such jurisdiction so as to thereafter be limited or reduced to the extent required to be deemed legal, valid and enforceable in such jurisdiction and that comes closest to expressing the intention of the Parties with respect to the covenant, and the covenant shall be enforceable as so modified. The Parties agree that a court with proper jurisdiction shall be allowed to reduce

the Restrictive Covenants to the maximum duration, activity, subject, and geographic area of restriction deemed legal, valid and enforceable.

(iv)     The Parties agree that nothing in the Restrictive Covenants is intended to supersede any similar restriction or obligation that may be contained in the Service Agreement, and, in the event of any conflict between the Restrictive Covenants and the Service Agreement, the provisions that are more protective of the Company Group shall control.

(g)     **Legally Protected Communications and Disclosures.**

(i)     Nothing in this Section 7 is to be interpreted to: (A) prevent, interfere with, or otherwise restrain Incentive Unitholder's legitimate exercise of his or her Section 7 rights, if any, under the National Labor Relations Act or to otherwise interfere with any legally-protected communications; (B) interfere with Incentive Unitholder's rights under any federal, state, or local constitution, statute, rule, or regulation to file or otherwise institute a complaint or charge of discrimination, retaliation, or other alleged violation of discrimination or other employment-related laws with any federal, state, or local government agency enforcing such laws, to participate in a proceeding with any such agency, or to cooperate with any such agency in its investigation of such complaint or charge; or (C) prohibit Incentive Unitholder from speaking with law enforcement, the U.S. Equal Employment Opportunity Commission, a local commission on human rights, or an attorney retained by him or her.

(ii)     This Section 7 does not prohibit or restrict Incentive Unitholder (or Incentive Unitholder's attorney) from responding to any inquiry about the issuance of the Incentive Units, or their underlying facts and circumstances by the Securities and Exchange Commission, the Financial Industry Regulatory Authority, any other self-regulatory organization or governmental entity, or making other disclosures that are protected under the whistleblower provisions of federal law or regulation. Incentive Unitholder does not need the prior authorization of the Company Group to make any such reports or disclosures and is not required to notify the Company Group that Incentive Unitholder has made such reports or disclosures.

8.     **Representations and Warranties of Incentive Unitholder**. Incentive Unitholder hereby represents and warrants to the Company as follows:

(a)     This Agreement constitutes a legal, valid and binding obligation of Incentive Unitholder, enforceable in accordance with its terms, and the execution, delivery and performance of this Agreement by Incentive Unitholder does not and will not conflict with, violate or cause a breach of any agreement, contract or instrument to which Incentive Unitholder is a party or by which Incentive Unitholder is bound or any judgment, order or decree to which Incentive Unitholder is subject.

(b)     Incentive Unitholder has (i) received all the information Incentive Unitholder considers necessary in connection with Incentive Unitholder's execution of this Agreement, and (ii) had an adequate opportunity (A) to ask questions and receive answers from the Company and Incentive Unitholder's independent counsel regarding the terms, conditions and limitations set forth in this Agreement, the Company LLC Agreement and the business, properties, prospects and financial condition of the Company and its Affiliates and (B) to obtain additional information (to the extent the Company possesses such information or could acquire it without unreasonable effort or expense) necessary to verify the accuracy of any information furnished to Incentive Unitholder or to which Incentive Unitholder had access.

(c)     Incentive Unitholder understands that the Incentive Units are not registered under the Securities Act on the ground that the grant provided for in this Agreement and the issuance of securities

102175147.2

6

hereunder are exempt from registration under the Securities Act pursuant to Section 4(a)(2) thereof or pursuant to Rule 701 promulgated thereunder and cannot be disposed of unless (i) they are subsequently registered or exempted from registration under the Securities Act or applicable securities laws and (ii) such disposition is permitted under this Agreement and the Company LLC Agreement.

(d)     None of the Company, the Employer or their respective Affiliates or any of their respective managers, directors, officers, employees or authorized representatives (including attorneys, accountants, consultants, bankers or financial representatives) has provided any tax or legal advice to Incentive Unitholder regarding this Agreement, and Incentive Unitholder has had an opportunity to receive sufficient tax and legal advice from advisors of Incentive Unitholder's own choosing such that Incentive Unitholder is entering into this Agreement with full understanding of the tax and legal implications thereof.

9.     **General Provisions**.

(a)     **Certain Definitions.** For purposes of this Agreement, the following terms shall have the following meanings:

(i)     "**Cause**" means, with respect to Incentive Unitholder, (A) if such term is defined in an Equity Agreement or Service Agreement to which such Incentive Unitholder is a party, the meaning ascribed to such term therein, or (B) if such term is not defined in either an Equity Agreement or a Service Agreement to which Incentive Unitholder is a party, one or more of the following: (1) the commission of or plea of nolo contendere to a felony or other crime involving moral turpitude or the commission of any crime involving misappropriation, embezzlement, conversion of any property (including confidential or proprietary information) or business opportunities or fraud with respect to the Company Group or any of their customers or suppliers; (2) conduct causing any member of the Company Group substantial public disgrace or disrepute or economic harm; (3) repeated failure to perform duties assigned by the Company Group; (4) any act or knowing omission aiding or abetting a competitor, supplier or customer of the Company Group to the disadvantage or detriment of the Company Group; (5) breach of fiduciary duty, gross negligence or willful misconduct with respect to the Company Group; (6) a material violation of any of the policies of the Company Group that have been communicated to Incentive Unitholder in writing (including through posting on a website of a member of the Company Group), including gross insubordination; or (7) any other material breach by Incentive Unitholder of this Agreement or any other agreement between Incentive Unitholder and the Company Group which is incurable or not cured to the Board's reasonable satisfaction within ten (10) days after written notice thereof to Incentive Unitholder.

(ii)     "**Competing Business**" means the business of developing (including intellectual property), constructing, financing, owning, or operating one or more lithium-ion battery production plants.

(iii)     "**Confidential Information**" means information that is not generally known to the public (including the existence and content of the Incentive Units) and that is used, developed or obtained by the Company Group in connection with its business, including, but not limited to, information, observations and data obtained by Incentive Unitholder during his or her Service with the Company Group concerning (A) the business or affairs of the Company Group (or any predecessor thereof) and (B) products, services, fees, costs, pricing structures, analyses, drawings, photographs and reports, computer software (including operating systems, applications and program listings), data bases, accounting and business methods, inventions, devices, new developments, methods and processes (whether patentable or unpatentable and whether or not reduced to practice), customers and clients and customer and client lists, information on current and prospective independent sales agents, software vendors or partners and sponsor banks, all technology and trade secrets, and all similar and related information in whatever form. Notwithstanding the foregoing, "**Confidential Information**" will not include any information that has been

published in a form generally available to the public prior to the date Incentive Unitholder proposes to disclose or use such information other than as a result of a breach of any confidentiality obligation owed to any member of the Company Group.

(iv)     "**Service**" means the provision of employment, contractor or other services by Incentive Unitholder to the Company Group as an employee or other service provider.

(v)     "**Work Product**" means all inventions, innovations, improvements, technical information, systems, software developments, methods, designs, analyses, drawings, reports, service marks, trademarks, trade names, trade dress, logos and all similar or related information (whether patentable or unpatentable) which relates to the actual or anticipated business, operations, research and development or existing or future products or services of the Company Group and which are conceived, developed or made by Incentive Unitholder (whether or not during usual business hours and whether or not alone or in conjunction with any other Person) during Incentive Unitholder's Service, together with all patent applications, letters patent, trademark, trade name and service mark applications or registrations, copyrights and reissues thereof that may be granted for or upon any of the foregoing.

(b)     **Notices**. Any notice to be given under this Agreement shall be personally delivered in writing or shall have been deemed duly given after it is posted in the United States mail, postage prepaid, registered or certified, return receipt requested, to, if with respect to the Company, iM3NY LLC 2228 COE,45 Murray Hill Rd, Vestal NY, 13850, Attention: The Managing Members, or, if to Incentive Unitholder, the last address Incentive Unitholder has filed with the Employer, as reflected on the Employer's records. Any such notice shall, if delivered personally, be deemed received upon delivery; and shall, if delivered by internationally-recognized overnight or second-day courier service, be deemed received on the second (2nd) Business Day after being sent.

(c)     **Governing Law**. This Agreement and the obligations of the Parties shall be construed and enforced in accordance with the laws of the State of Delaware, excluding any conflicts of law rule or principle that might refer such construction to the laws of another jurisdiction.

(d)     **Amendment and Waiver; Entire Agreement**. Except as expressly set forth in this Agreement and the Service Agreement, the Company LLC Agreement constitutes the entire agreement between the Parties concerning the subject matter hereof and shall be modified only by written amendment signed by the Party or Parties upon whom the amendment imposes or may impose any additional duties or obligations. To the extent of any conflict between the provisions of this Agreement, on the one hand, and the provisions of the Company LLC Agreement or the Service Agreement, on the other hand, in each case, the provisions of this Agreement shall control, provided that, the Service Agreement shall control to the extent set forth in Section 7(f)(iv).

(e)     **Severability**. If an arbitrator or court of competent jurisdiction determines that any provision of this Agreement (or portion thereof) is invalid or unenforceable, then the invalidity or unenforceability of that provision (or portion thereof) shall not affect the validity or enforceability of any other provision of this Agreement, and all other provisions shall remain in full force and effect.

(f)     **Counterparts**. This Agreement may be executed in one or more counterparts (including portable document format (.pdf) counterparts), each of which shall be deemed to be an original, and all of which together shall constitute one and the same agreement.

(g)     **Successors and Permitted Assigns**. Except as otherwise provided in this Agreement, this Agreement shall bind and inure to the benefit of and be enforceable by and against Incentive Unitholder, the Company and their respective successors, permitted assigns and representatives,

as the case may be (including subsequent holders of the Incentive Units); *provided, however*, that the rights and obligations of Incentive Unitholder under this Agreement shall not be assignable except in connection with a transfer of the Incentive Units permitted under the Company LLC Agreement and this Agreement. Notwithstanding anything to the contrary in this Agreement or the Company LLC Agreement, (i) each Incentive Unit initially issued to Incentive Unitholder by the Company shall remain subject to the terms of the Company LLC Agreement and this Agreement (including Sections 4 and 5, which shall be applied based on whether Incentive Unitholder Remains an Employee, rather than if any holder of such Unit Remains an Employee), regardless of who holds such Incentive Unit, and (ii) the effects of whether Incentive Unitholder Remains an Employee, or events related to such status have on the rights of and restrictions on such Incentive Units, including vesting and forfeiture, and the rights (including repurchase rights) of the Company with regard to such Incentive Units, under this Agreement and the Company LLC Agreement, shall not be altered by any transfer of such Incentive Units. For the avoidance of doubt, all Permitted Transferees (including spouses and former spouses of Incentive Unitholder) shall be subject to Sections 4 and 5 as if they were a Party to this Agreement, regardless of whether any such Permitted Transferee Remains an Employee.

(h)     **Rights of Third Parties**. Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any Person, other than the Parties and the estate, legal representative or guardian of any individual Party and, in the case of the Company, the other members of the Company Group, any rights or remedies under or by reason of this Agreement.

(i)     **Survival of Representations, Warranties and Agreements**. All representations, warranties and agreements contained in this Agreement shall survive the consummation of the transactions contemplated hereby and the termination of this Agreement.

(j)     **Jurisdiction; Service of Process; Waiver of Jury Trial**. Each of the Parties submits to the exclusive jurisdiction of the United States District Court or the Delaware Court of Chancery (or the Superior Court only if the Court of Chancery lacks subject matter jurisdiction) located in Wilmington, Delaware in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceeding may be heard and determined in such court. Each Party also agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court. Each of the Parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto. Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 9(b) above. Nothing in this Section 9(j), however, shall affect the right of any Party to serve legal process in any other manner permitted by law or at equity. Each Party agrees that a final judgment in any action or proceeding so brought (subject to any rights of appeal) shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law or at equity. EACH PARTY HEREBY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(k)     **Specific Performance**. A breach of this Agreement by Incentive Unitholder would cause irreparable harm to the Company Group and the damages relating to any such breach may be difficult to calculate. As such, the Company shall be entitled to pursue specific performance and other equitable relief, including an injunction to prevent a breach of this Agreement. The remedies described in this paragraph shall not be deemed to be the exclusive remedies available to the Company for a breach by

102175147.2

Incentive Unitholder of this Agreement, but shall be in addition to all other remedies available at law or equity.

(l) **Spousal Provisions**.

(i)    If Incentive Unitholder is married on the Grant Date, then Incentive Unitholder shall cause his or her spouse to execute a spousal consent in the form set forth on the signature page hereto (the "**Spousal Consent**") to evidence such spouse's agreement and consent to abide by and be bound by the terms and conditions of this Agreement as to such spouse's interest, whether as community property or otherwise, if any, in the Units held by Incentive Unitholder. Notwithstanding the execution and delivery thereof, such Spousal Consent shall not be deemed to confer or convey to such spouse any rights in Incentive Unitholder's Units that do not otherwise exist by operation of law or by agreement of the Parties. If Incentive Unitholder should marry or remarry subsequent to the Grant Date, Incentive Unitholder shall, within thirty (30) days thereafter, obtain his or her new spouse's acknowledgement of and consent to the existence and binding effect of all restrictions contained in this Agreement by causing such spouse to execute and deliver a Spousal Consent. If any spouse of Incentive Unitholder fails to execute the Spousal Consent as required hereunder, until such time as the Spousal Consent is duly executed by such spouse, Incentive Unitholder's economic rights associated with the Units will be suspended and not subject to recovery.

(ii)    In the event of a property settlement or separation agreement between Incentive Unitholder and his or her spouse, to the extent any interest in or with respect to the Units is assigned to Incentive Unitholder's spouse or former spouse, Incentive Unitholder shall use his or her best efforts to assign to such spouse or former spouse only the right to share in profits and losses, to receive distributions, and to receive allocations of income, gain, loss, deduction or credit or similar item to which Incentive Unitholder was entitled with respect to the Units.

(iii)    If a spouse or former spouse of Incentive Unitholder acquires all or a portion of the Incentive Units held by Incentive Unitholder as a result of any property settlement or separation agreement, such spouse or former spouse hereby grants an irrevocable power of attorney (which will be coupled with an interest) to Incentive Unitholder to give or withhold such approvals with respect to any Incentive Units (for purposes of this Agreement, the Company LLC Agreement or otherwise) as Incentive Unitholder will himself or herself approve with respect to such matter and without the necessity of the taking of any action by any such spouse or former spouse. Such power of attorney will not be affected by the subsequent disability or incapacity of the spouse or former spouse granting such power of attorney. Furthermore, such spouse or former spouse agrees that Company will have the right (but not the obligation) at any time to repurchase all or any portion of the Incentive Units, if any, acquired by such spouse or former spouse at Fair Market Value, as determined by the Board as of the date the Company elects to so repurchase the Incentive Units.

*[Signature Page Follows]*

**IN WITNESS WHEREOF,** the Parties have executed this Incentive Unit Award Agreement as of the date first written above.

iM3NY LLC

By: _____

Name: Shailesh Upreti
Title: Managing Member

INCENTIVE UNITHOLDER

_____

Printed Name: Paul Stratton

SIGNATURE PAGE
TO
INCENTIVE UNIT AWARD AGREEMENT

**SPOUSAL CONSENT**

Incentive Unitholder's spouse, if any, is fully aware of, understands and fully consents and agrees to the provisions of each of this Agreement and the Company LLC Agreement and their binding effect upon any marital, elective share or community property interests he or she may now or hereafter own, and agrees that the termination of his or her and Incentive Unitholder's marital relationship for any reason shall not have the effect of removing any Incentive Units otherwise subject to this Agreement and the Company LLC Agreement from coverage hereunder and thereunder and that his or her awareness, understanding, consent and agreement are evidenced by his or her signature below.

**SPOUSE**

6/14/2021

Name: _____ Molly Stratton _____

102175147.2

SPOUSAL CONSENT
TO
INCENTIVE UNIT AWARD AGREEMENT

EXHIBIT B

CONSENT TO SUE UNDER THE FLSA

I, Paul Stratton, hereby consent to be a Plaintiff in an action under the Fair Labor Standards Act, 29 USC Section 201 et seq., to secure any unpaid wages, overtime pay, liquidated damages, attorneys fees costs and other relief arising out of my employment with Imperium3 New York, Inc., Chaitanya Sharma, Shailesh Upreti and Frank Poullas and any other associated parties.  I authorize Law Office of Robert D. McCreanor, P.L.L.C. and any associated attorneys as well as any successors and assigns to represent me in this action.

Paul Stratton


Date: June 19, 2023

# EXHIBIT C

NRF Draft of April 14, 2021

**Imperium3 New York, Incorporated**
2228 Center of Excellence
85 Murray Hill Road
Vestal, NY 13850

April 19, 2021

Mr. Paul Stratton

     Re:    Employment with Imperium3 New York, Incorporated

Dear Paul:

On behalf of Imperium3 New York, Incorporated (the "Company"), I am pleased to confirm in this letter agreement (this "Letter") the terms of your continued employment with the Company in the position of Senior Vice President, Sales & Marketing, reporting to the Chief Executive Officer of the Company (the "CEO"). This Letter and its accompanying exhibit summarizes important details and key terms of your employment.

1.    Position. Your duties and responsibilities will include those customary for a Senior Vice President, Sales& Marketing of a U.S. corporation similar to the Company, subject, however, to the control of the CEO and the board of directors of the Company (the "Board"), and such other duties and responsibilities that may be assigned to you from time to time by the CEO or the Board. Your position will be based in the Company's principal location once fully established in Endicott, New York (expected to be this summer). Until such time, we understand that you will generally be working from your personal residence. During your employment, (a) you agree to devote your full time, attention, skill, and energy to the duties set forth herein and to the business of the Company, (b) you agree to use your best efforts to promote the success of such business, (c) you agree not be employed by or provide services to any other entity, person, or business, except with the prior written consent of the Company, and (d) you will be subject to any Company policies that may be in effect from time to time.

2.    Compensation. During your employment, your base salary will be paid to you at the annualized rate of $150,000, less all tax and other permitted withholdings and deductions. Your salary shall be paid in accordance with the Company's payroll practices as in effect from time to time (currently, semi-monthly), and may be adjusted as appropriate from time to time in line with your job performance and with the general development of the Company. You will be an "exempt" employee not entitled to overtime pay.

In addition, you will be eligible to participate in the Company's performance bonus plan, once it is established and as it is in effect from time to time. Your target annual performance bonus under any such plan will be equal to thirty (30%) of your annual base salary. You are also eligible to earn an annual sales bonus of $100,000 based on you achieving your sales goals as set aside by the CEO and the Board. Until production starts, in lieu of sales bonus, you will be eligible to earn a target bonus of $15,000 based on you achieving a signed sales contracts goal as set aside by the CEO and the Board.

3.     <u>Business Expenses; Relocation</u>. You shall be entitled to reimbursement for all reasonable and necessary out-of-pocket business, entertainment, and travel expenses that you incur in connection with the performance of your duties hereunder in accordance with the Company's expense reimbursement policies and procedures, as in effect from time to time.

Subject to the advance approval of the Board, you will be entitled to reimbursement for reasonable, one-time relocation costs for your move to the Endicott, New York area, but in no event to exceed $10,000. To receive such reimbursement, you must submit to the Company a reimbursement request, along with supporting documentation, within thirty (30) days of your incurring the expense, and the Company will thereafter reimburse you for covered costs as soon as practicable, but in no event later than March 15 of the year following the year in which the expense was incurred. Reimbursable relocation costs shall <u>not</u> include, without limitation, any closing costs or losses incurred on the sale of your personal residence.

4.     <u>Benefits</u>. During your employment, and provided that you satisfy and continue to satisfy any eligibility requirements, you will be entitled to participate in employee benefit plans made available by the Company from time to time to similarly-situated employees of the Company. At this time, the Company has not yet established any such benefit plan, but anticipates establishing a health insurance plan and a 401(k) retirement plan in the near future. Notwithstanding the foregoing, the Company is not committing to establishing any specific employee benefit plan by any specific date, and any such employee benefit plan may be amended, suspended, or terminated from time to time in the Company's sole discretion.

5.     <u>Paid Time Off</u>. During your employment, you will be eligible to accrue up to a maximum of twenty (20) days of vacation per calendar year. Your vacation will accrue on a monthly basis at a rate of one-and-two-thirds (1.67) days per month worked, or as otherwise provided by the Company's vacation policy in effect from time to time. This vacation time is in addition to the paid holidays generally observed by the Company in the United States in accordance with the holiday policy of the Company in effect from time to time. In addition, during your employment, you will be entitled to fifteen (15) paid sick days per calendar year in accordance with the sick day policy of the Company in effect from time to time. The accrual, use, and carryover of paid-time-off is subject to Company policy as in effect from time to time. All paid-time-off will be forfeited, without payment, upon termination of employment, unless otherwise expressly provided by the Company in writing.

6.     <u>Termination of Employment</u>. You may resign from your employment with the Company at any time, provided that you provide at least three (3) months of advance written notice of such decision to the Company. The Company reserves the right to withdraw any and all duties and responsibilities from you, and to exclude you from the Company's premises, during all or any part of such notice period. However, in such event, you will remain an employee of the Company and will continue to be paid your base salary for the duration of the notice period.

The Company may terminate your employment with the Company at any time and for any reason by providing you with at least three (3) months of advance written notice of such decision, provided that, if the Company terminates your employment with "Cause" (as defined below), then no advance notice from the Company shall be required. The Company reserves the right to withdraw any and all duties and responsibilities from you, and to exclude you from the Company's premises, during all or any part of such notice period. However, in such event, you will remain an employee of the Company and will continue to be paid your base salary for the duration of the notice period.

For purposes of this Letter, "Cause" means: (i) your commission of an act of malfeasance, dishonesty, fraud, or breach of trust against the Company or any of its employees, directors, owners, contractors, customers, or suppliers; (ii) your breach of any of your obligations under this Letter, Exhibit A hereto, or any other agreement between you and the Company; (iii) your failure to comply in any material respect with any of the Company's written policies in effect from time to time; (iv) your willful failure, neglect, or refusal to perform the duties of your job, or to follow the lawful written directions of the Company; (v) your conviction of, or plea of guilty or no contest to, any crime involving moral turpitude or any felony; (vi) any act or omission by you that is, or is reasonably likely to be, materially injurious to the financial condition or business reputation of the Company, or that otherwise is materially injurious to the Company's employees, directors, contractors, customers, or suppliers; (vii) your use of an illegal drug or, without a proper prescription, the use of any controlled substance, or your abuse of any legally prescribed drug; or (viii) your inability, as a result of repeated alcohol use, to perform the duties and/or responsibilities of your position.

7.   <u>Restrictive Covenants</u>. Upon your signing of this Letter, and in consideration of the employment and compensation provided hereunder, you agree to be bound by the terms of the Company's Confidentiality, Assignment of Inventions, and Restrictive Covenant Agreement in the form attached as <u>Exhibit A</u> (the "<u>Covenant Agreement</u>"). Your continued employment is contingent upon your execution of the Covenant Agreement.

8.   <u>No Prior Restrictions</u>. You represent and warrant that your employment with the Company will not violate, or cause you to be in breach of, any obligation or covenant made to any current or former employer or other third party, and that during the course of your employment with the Company you will not take any action that would violate or breach any legal obligation that you have to any current or former employer or other third party. In the event of your breach of this paragraph, including in the event that your representation and warranty is false, you agree that you will hold the Company harmless and indemnify it for any damages resulting to it, including, without limitation, attorneys' fees, as a result of the breach of this paragraph.

9    <u>Indemnification</u>. The Company will indemnify you in accordance with the Company's by-laws as they may be in effect from time to time.

10.   <u>Miscellaneous</u>. This Letter and Exhibit A constitute the entire understanding between you and the Company with respect to the subject matter hereof and thereof, and supersede any prior understanding and/or written or oral agreements between you and the Company with respect to such subject matter. This Letter shall be governed by the laws of

the State of New York, without regard to the principles of conflicts of laws of the State of New York or any other jurisdiction. This Letter may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. Delivery of an executed counterpart of the signature page to this Letter by electronic transmission shall be effective as delivery of a manually executed counterpart of this Letter.

If this Letter correctly sets forth the terms under which you are and will be employed by the Company, please sign one copy in the space provided below and return it to me.

*[Signature Page Follows]*

Sincerely,

**IMPERIUM3 NEW YORK, INCORPORATED**

By: _____
Name: Chaitanya Sharma
Title: Chief Executive Officer and
President

The foregoing correctly sets forth the terms of my employment with the Company and I agree with those terms. In signing this Letter, I am not relying on any representations other than as set out above and attached in Exhibit A.

_____
Paul Stratton

5/25/21
Date

NRF Draft of April 14, 2021

## EXHIBIT A

## CONFIDENTIALITY, ASSIGNMENT OF INVENTIONS
## AND RESTRICTIVE COVENANT AGREEMENT

In consideration and as a condition of my employment relationship ("My Employment") with Imperium3 New York, Incorporated (the "Company"), I, Paul Stratton, agree to the terms and provisions of this Confidentiality, Assignment of Inventions and Restrictive Covenant Agreement (this "Agreement") as follows:

1. Confidential Information.

I agree that all confidential information, whether in writing or other form, concerning the Company's business, technology, intellectual property, business relationships, or financial or other activities or affairs (collectively, "Confidential Information") is and will be the exclusive property and intellectual property of the Company. For purposes of this Agreement, "Confidential Information" also includes information received in confidence by the Company from its customers or suppliers or other third parties. "Confidential Information" may include, by way of example and without limitation, information about finances, pricing, costs, customers, vendors, collaborators, employees, research and development, technology (including but not limited to scientific, medical or otherwise), operations, processes, products, services, manufacturing, marketing, strategies, business plans, passwords, systems and other computer information. "Confidential Information" does not include any of the foregoing information that (i) has entered the public domain other than by a breach of this Agreement or other obligation to maintain the confidentiality of such information, or (ii) is obtained by me lawfully from a third party without a breach by such third party of its confidentiality, fiduciary, or legal obligations.

I agree that I will not, at any time, without the Company's prior written permission, either during or after My Employment, disclose any Confidential Information to anyone outside of the Company, or use or permit to be used any Confidential Information for any purpose other than the performance of my duties as an employee of the Company. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure of all Confidential Information. I will deliver to the Company (or, at the Company's request, permanently delete) all copies of Confidential Information in my possession or under my control upon the earlier of a request to do so by the Company or termination of My Employment. Notwithstanding anything contained in this Agreement to the contrary, I understand that I will be permitted to disclose Confidential Information to the extent required by validly-issued legal process or court order, provided that, to the extent that I am not legally prohibited from doing so, (i) I notify the Company immediately (and in advance) of any such legal process or court order in an effort to provide the Company with as much time as possible to allow the Company to challenge such legal process or court order, if the Company so elects, before I disclose any Confidential Information, (ii) I cooperate with any efforts of the Company to contest such disclosure, and (iii) I further cooperate with the Company in its efforts to limit the scope of the proposed use and disclosure of, and obtaining appropriate means of protecting the confidentiality of, the Confidential Information, and further provided that any disclosure ultimately made by me

under this sentence is limited to such information that I am advised by my counsel in writing is legally required to be disclosed.

In accordance with the Defend Trade Secrets Act of 2016, I acknowledge that I have been notified by the Company that I will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (i) is made (x) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (y) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding. I acknowledge that I have been further notified by the Company that, if I file a lawsuit for retaliation against me by the Company for reporting a suspected violation of law, then I may disclose the Company's trade secrets to my attorney and use the trade secret information in the court proceeding if: (A) I file any document containing the trade secret under seal; and (B) I do not disclose the trade secret, except pursuant to court order.

I agree that I will not, at any time, without the Company's prior written permission, either during or after My Employment, remove from the Company's facilities (including any premises that the Company may occupy from time to time as well as any and all information technology systems), or retain or use, any documents, records, notebooks, files, correspondence, reports, memoranda, computer tapes or disks or similar materials of or containing Confidential Information (whether the foregoing are in physical or electronic form), or other materials or property of the Company of any kind (collectively, "Materials"), unless (i) necessary during My Employment to perform my duties and responsibilities for the Company and (ii) such removal, retention or use is for the benefit of the Company and accomplished during My Employment in accordance with all applicable policies and procedures of the Company. If I remove any Materials pursuant to the foregoing clauses (i) and (ii), I agree that I shall return such Materials to their proper files or places of safekeeping as promptly as possible after the removal has served its specific purpose. Except as may be necessary in the discharge of my assigned duties, I agree that I shall not make, retain, remove or distribute any copies of any of such Materials for any reason whatsoever, and I agree that I shall not divulge to any third person the nature or contents of any of such Materials or of any oral or written information. Upon the earlier of the Company's request or the termination or cessation of My Employment, I agree that I shall return to the Company all originals and copies of such Materials then in my possession or custody or under my control, whether such Materials were prepared by me or others.

2. Inventions.

I agree that I will fully and promptly disclose to the Company all inventions, discoveries, designs, developments, methods, modifications, improvements, processes, algorithms, mask works, databases, computer programs, formulae, techniques, trade secrets, graphics or images, and audio or visual works and other works of authorship (collectively, "Inventions"), whether or not patentable or copyrightable. I acknowledge that all work performed by me is on a "work for hire" basis, and I hereby do assign and transfer and, to the extent any such assignment cannot be made at present, will assign and transfer, to the Company and its successors and assigns all my right, title and interest in all Inventions that: (i) relate to the business or proposed business of the Company or any

customer of, collaborator with, or supplier to the Company, or to any of the products or services being researched, developed, manufactured or sold by the Company, or which may be used with such products or services; (ii) result from tasks assigned to me by the Company; or (iii) result from the use of premises, personnel, resources, property, or funding of the Company (collectively, "Company-Related Inventions"), and all related patents, patent applications, trademarks and trademark applications, copyrights and copyright applications, and other intellectual property rights in all countries and territories worldwide and under any international conventions (collectively, "Intellectual Property Rights"). I understand that, if this Agreement is required to be construed in accordance with the laws of any state which precludes or limits any of the foregoing assignment, then this Section 2 will be interpreted not to apply to any such assignment that is so precluded or limited.

I agree that I will not incorporate, or permit to be incorporated, any Prior Invention (as defined below) into any Company-Related Invention without the Company's prior written consent. For purposes of this Agreement, a "Prior Invention" is any Invention that I have, alone or jointly with others, conceived, developed or reduced to practice prior to the commencement of My Employment with the Company that I consider to be my property or the property of third parties. If, in the course of My Employment, I incorporate a Prior Invention into a Company product, process or machine or other work done for the Company, then I hereby grant to the Company a nonexclusive, royalty-free, paid-up, irrevocable, perpetual, worldwide, assignable license (with the full right to sublicense) to make, have made, modify, use, make derivative works of, sell, offer for sale and import such Prior Invention. To the extent permitted by law, any license that I grant to the Company under this Agreement includes all rights of paternity, integrity, disclosure, and withdrawal, and any other rights that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or other similar rights. To the extent that any of the foregoing is ineffective under applicable law, I hereby provide and will further provide as necessary any and all ratifications and consents necessary to accomplish the purposes of the foregoing to the greatest extent possible.

I agree that I will cooperate fully with the Company, both during and after My Employment, with respect to the procurement, maintenance and enforcement of Intellectual Property Rights in Company-Related Inventions. I agree that I will sign, both during and after My Employment, all papers, including without limitation copyright applications, patent applications, declarations, oaths, assignments of rights, and powers of attorney, which the Company may deem necessary or desirable in order to protect its rights and interests in any Company-Related Invention. In addition, I hereby constitute and appoint the Company and its successors and assigns as my true and lawful attorney, with full power of substitution for me and my representatives, and in their name, place and stead or otherwise, but on behalf of and for the benefit of the Company and its successors and assigns, to take all actions and execute all documents on my behalf necessary to effect the assignment set forth in this Section 2, and from time to time to institute and prosecute in my name or otherwise, but at the direction and expense and for the benefit of the Company and its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Company or its successors or assigns may deem proper in order to collect, assert or enforce any claim, right or title of any kind in and to the Company-Related Inventions and to defend and compromise any and all actions, suits and proceedings in respect of any of

NRF Draft of April 14, 2021

the Company-Related Inventions and to do any and all such acts and things in relation thereto as the Company or its successors or assigns shall deem advisable, and I hereby declare that the appointment hereby made and the powers hereby granted are coupled with an interest and are and shall be irrevocable by me and my representatives in any manner or for any reason.

3. <u>Restrictive Covenants</u>.

During My Employment (which, for the avoidance of doubt, is inclusive of any notice period) and, in the event that My Employment is terminated for Cause (as defined in my employment letter agreement), for the twelve (12)-month period immediately thereafter (the "<u>Non-Compete Period</u>"), I will not, directly or indirectly, either for myself or through or on behalf of any other person or entity, as an employee, advisor, agent, consultant, director, equity holder, manager, co-partner, or in any other individual or representative capacity, own, operate, manage, control, engage in, invest in, be employed by or participate in any manner in, act as a consultant or advisor to, or render services for any venture or enterprise that, in whole or in part, directly or indirectly engages (or is preparing to engage), anywhere in the "Restricted Area" (as defined below), in all or any part of the "Restricted Business" (as defined below). Further, during the Non-Compete Period, I will not, directly or indirectly, either for myself or through or on behalf of any other person or entity, provide services to any business or enterprise where such services would require that I use or disclose any Confidential Information. I acknowledge that nothing in this paragraph is to be construed to prevent me from investing in the stock of any business or enterprise that is engaged in a Restricted Business and that is either listed on a national securities exchange or traded in the over-the-counter market, so long as I am not involved in such business or enterprise and I do not own more than five percent (5%) of the equity of such business or enterprise. For purposes of this Agreement, (a) "<u>Restricted Area</u>" means the United States and any other country in which the Company does business, and (b) "<u>Restricted Business</u>" means the business of developing (including intellectual property), constructing, financing, owning, or operating one or more lithium-ion battery production plants.

During My Employment (which, for the avoidance of doubt, is inclusive of any notice period) and for the twelve (12)-month period immediately thereafter (the "<u>Non-Solicit Period</u>"), regardless of the reason that My Employment terminates, I will not, directly or indirectly, either for myself or through or on behalf of any other person or entity, (i) solicit business from any person or entity (A) that is, or was during the one (1)-year period preceding the date of such solicitation, a customer, prospective customer, supplier, vendor, licensor, lessor, or other business relation of the Company and (B) with whom I had material contract during the course of My Employment or about whom I was privy to confidential or non-publicly available commercial information during the course of My Employment (a "<u>Designated Business Contact</u>"), and in any case, for the purpose of securing business or contracts related to (or competitive with) the Restricted Business, or (ii) induce or attempt to induce any Designated Business Contact to cease or refrain from doing business with the Company, or in any way interfere with the relationship (or prospective relationship) between any Designated Business Contact and the Company. Notwithstanding the preceding sentence, the restriction on soliciting business contained in clause (i) of the preceding sentence will not apply to any customers, prospective customers, suppliers, vendors, licensors, lessors, and other business relations of the Company with

whom I had business relationships prior to the commencement of my employment with the Company. For purposes of this Agreement, a "customer" or a "prospective customer" is any person or entity to which the Company, as of the applicable time, provided, or planned to provide, goods or services at any time during the period commencing six (6) months prior to My Employment and ending on the date My Employment ends.

During the Non-Solicit Period, regardless of the reason that My Employment terminates, I will not, directly or indirectly, either for myself or through or on behalf of any other person or entity, (i) solicit, hire, retain, employ, or engage, as an employee, consultant, or otherwise, any employee, consultant, or other service provider of the Company (each, a "Designated Individual"), or attempt to do the same, or (ii) induce or encourage, or attempt to induce or encourage, any Designated Individual to leave the employ of the Company, or otherwise intentionally interfere or attempt to interfere with the relationship between any Designated Individual and the Company. I acknowledge that nothing set forth in this paragraph will restrict my ability to utilize general solicitations for employees or consultants, so long as (A) such general solicitations are not targeted at any Designated Individual and (B) I do not hire, retain, employ, or engage any Designated Individual.

I acknowledge that this Agreement (including without limitation the restrictions set forth in this Section 3) is reasonable and necessary to protect the legitimate interests of the Company and I understand that the Company may sustain irreparable injury if I violate this Agreement.

4. Company Group.

For purposes of Sections 1, 2, and 3 above, I acknowledge that "the Company" shall be deemed to refer to the Company, the Company's direct parent, and any other company or entity controlled, directly or indirectly, in whole or in part, by the Company's parent from time to time (such as any subsidiary or brother-sister company of the Company that may exist from time to time).

5. Permitted and Legally-Protected Communications and Disclosures.

I understand that nothing in this Agreement is to be interpreted to prevent, interfere with, or otherwise restrain my legitimate exercise of my Section 7 rights, if any, under the National Labor Relations Act or to otherwise interfere with any legally-protected communications.

I understand that nothing in this Agreement is to be interpreted to interfere with my rights under any federal, state, or local constitution, statute, rule, or regulation to file or otherwise institute a complaint or charge of discrimination, retaliation, or other alleged violation of discrimination or other employment-related laws with any federal, state, or local government agency enforcing such laws, to participate in a proceeding with any such agency, or to cooperate with any such agency in its investigation of such complaint or charge. I understand that nothing in this Agreement is to be interpreted to prohibit me from speaking with law enforcement, the U.S. Equal Employment Opportunity Commission, a local commission on human rights, or an attorney retained by me.

I understand that nothing in this Agreement is to be interpreted to interfere with my right to report possible violations of federal law or regulation to any government agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, Congress, and any federal agency Inspector General, or from making other disclosures that are protected under the whistleblower provisions of federal law or regulation (including, without limitation, reporting possible violations of federal laws or regulations in accordance with Section 21F of the Securities Exchange Act of 1934, as amended, and rules promulgated thereunder). I understand that I do not need the Company's permission to make any of the reports or disclosures described in this paragraph, nor am I required to inform the Company if I make any such report or disclosure.

6. Equitable Relief and Judicial Modification.

I acknowledge that the remedy at law for my breach of any of Sections 1, 2, or 3 above will be inadequate, and that the damages flowing from such breach will not be readily susceptible to being measured in monetary terms. Accordingly, upon a violation or threatened violation of any part of such Sections, the Company will be entitled to immediate injunctive relief (or other equitable relief) without having to demonstrate special or unique damages, and may obtain a temporary order from any court having proper jurisdiction restraining any future or further violation. No bond or other security will be required in obtaining such equitable relief, and I hereby consent to the issuance of such equitable relief. Nothing in this paragraph will be deemed to limit the Company's remedies at law or in equity for any breach by me of any of the parts of such Sections that may be pursued or availed of by the Company.

I acknowledge that it is the intent of the parties that the restrictions contained in Sections 1, 2, and 3 above be enforced to the fullest extent permissible under the laws of each jurisdiction in which enforcement is sought. If any restriction contained in such Sections is for any reason held by a court to be excessively broad as to duration, activity, geographical scope, or subject, then such restriction will be construed, judicially modified, or "blue penciled" in such jurisdiction so as to thereafter be limited or reduced to the extent required to be enforceable in such jurisdiction in accordance with applicable law. If any such restriction is held to be invalid, illegal, or unenforceable in any respect under any applicable law in any jurisdiction, then such invalidity, illegality, or unenforceability will not affect any other provision of this Agreement or any other jurisdiction, but such restriction will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal, or unenforceable restriction had never been contained in this Agreement.

7. Miscellaneous.

Survival and Assignment by the Company. I understand that my obligations under this Agreement will continue following the termination of My Employment regardless of the manner of such termination and will be binding upon my heirs, executors and administrators. The Company will have the right to assign this Agreement to its affiliates, successors and assigns. I expressly consent to be bound by the provisions of this Agreement for the benefit of the Company or any parent, subsidiary or affiliate to whom I may be transferred without the necessity that this Agreement be re-executed at the time of such transfer.

No Employment Relationship Obligation. I understand that this Agreement does not create an obligation on the Company or any other person to continue My Employment. I acknowledge that, unless otherwise agreed in a formal written agreement signed on behalf of the Company by an authorized officer, My Employment with the Company is at will and therefore may be terminated by the Company or me at any time and for any reason, with or without cause; provided that I understand that I am subject to a notice period prior to resigning from employment, as set forth in my employment letter agreement with the Company.

Entire Agreement; Governing Law. This Agreement constitutes the entire understanding between me and the Company with respect to the subject matter hereof, and supersedes any prior understanding and/or written or oral agreements between us with respect to such subject matter. This Agreement shall be governed by the laws of the State of New York, without regard to the principles of conflicts of laws of the State of New York or any other jurisdiction.

Severability. If any provision of this Agreement shall be invalid, illegal, or unenforceable, then it shall to the extent practicable be modified so as to make it valid, legal and enforceable and to retain as nearly as practicable the intent of the parties, and the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Independent Covenants. Each of my covenants set forth in Sections 1, 2, and 3 above will be construed as a covenant independent of any other covenant or provision of this Agreement or any other agreement between the parties, and the existence of any claim or cause of action by me against the Company, whether predicated on a covenant or provision of this Agreement or otherwise, will not constitute a defense to the enforcement by the Company of my covenants set forth in Sections 1, 2, and 3 above.

Amendment; Waiver. Any provision of this Agreement and my obligations or the rights of the Company hereunder may be amended or waived if, but only if, such amendment or waiver is in writing and is approved in writing by the Company and me, whereupon such amendment or waiver shall be binding on the Company and me.

Notices. All notices and other communications required or permitted hereunder shall be in writing and shall be deemed effectively given upon personal delivery, on the first business day following mailing by over-night or express courier, on the third day following mailing by registered or certified mail, return receipt requested, postage prepaid, or on the next business day following transmission by email, addressed to the Company or me, as applicable at the respective addresses included herein or in the records of the Company.

Counterparts; Execution by Electronic Transmission. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

NRF Draft of April 14, 2021

References and Construction. Whenever required by the context, and as used in this Agreement, the singular number shall include the plural and pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural. The provisions of this Agreement shall be construed according to their fair meaning and neither for nor against any party hereto irrespective of which party caused such provisions to be drafted. I acknowledge that I have been (or have been afforded the opportunity to be) represented by an attorney in connection with the review and execution of this Agreement.


IN WITNESS WHEREOF, the undersigned has executed this Confidentiality, Assignment of Inventions and Restrictive Covenant Agreement on the date and year set forth below.

Signed: _____

Print Name: _Paul Stratter_

Date: _5/25/21_

Address: _455 Ridys Road_
_Vestal NY 13850_